TEXAS EDUCATION AGENCY and
Forest Springs Subdivision,
Appellants,

v.

GOODRICH INDEPENDENT SCHOOL
DISTRICT, Appellee.

No. 03–94–00387–CV.

Court of Appeals of Texas,
Austin.

May 17, 1995.

Rehearing Overruled June 21, 1995.

Dan Morales, Atty. Gen., Christopher J. Maczka, Asst. Atty. Gen., Gen. Counsel Div., Austin, for appellants.

Roger D. Hepworth, Doanh "Zone" T. Nguyen, Henslee, Ryan & Groce, P.C., Austin, for appellee.

Before POWERS, JONES and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

 The Commissioner of Education ordered the Forest Springs subdivision detached from Goodrich Independent School District and annexed to Livingston Independent School District. Goodrich I.S.D. filed suit in district court seeking judicial review of the Commissioner's decision. The district court reversed the order and remanded the cause with instructions to the Commissioner to deny the proposed detachment and annexation. We will reverse the judgment of the district court and affirm the Commissioner's order.

## BACKGROUND

The Forest Springs subdivision borders on the Goodrich and Livingston school districts.

Twenty white students and two minority students live in Forest Springs, which is currently within the Goodrich I.S.D. boundary. Thirteen of these students have been attending Livingston schools without officially transferring to the school district. In 1987, the Texas Education Agency ("TEA") refused the requests of several Forest Springs students to transfer to Livingston I.S.D., explaining that the transfers violated Civil Order No. 5281 of the U.S. District Court of the Eastern District of Texas as modified (the "federal order").[1] The record is unclear as to which, if any, of the thirteen Forest Springs students unofficially attending Livingston I.S.D. were the students whose transfer requests were denied.

In 1991, after Livingston discovered the students' unofficial attendance and threatened to charge them tuition, the Forest Springs subdivision sought detachment from Goodrich and annexation to Livingston. The Livingston I.S.D. Board of Trustees approved Forest Springs' proposed annexation, but the Goodrich I.S.D. Board of Trustees denied the detachment request. Forest Springs appealed Goodrich's decision to the Commissioner of Education. *See* Tex.Educ. Code Ann. §§ 11.13, 19.022(i) (West 1991). Section 19.022(i) provides:

> If the board of trustees for either affected district disapproves the petition, an ag-

grieved party to the proceedings in either district may appeal the board's decision to the commissioner of education under Section 11.13 of this code. An appeal under this subsection is de novo. In deciding this appeal, the commissioner shall consider the educational interests of the students in the affected territory and the affected districts and the social, economic, and educational effects of the proposed boundary change.

Tex.Educ.Code Ann. § 19.022(i) (West 1991). Before the Commissioner's hearing on January 6, 1992, the parties stipulated that the proposed annexation would have "no substantial adverse educational, social, or economic effects to the students or to the school districts involved in this dispute," unless the Commissioner found that the annexation violated the federal order. Presumably, then, violation of the federal order was the sole educational effect the Commissioner was to consider.

With regard to boundary changes, the federal order directs the TEA and the Commissioner of Education not to:

> permit, make arrangements for, approve, acquiesce in, or give support of any kind to changes in school boundary lines—whether by detachment, annexation, or consolidation of districts in whole or in part—which

1. The federal order states that, with regard to student transfers, the TEA and the Commissioner of Education:

 shall not permit, make arrangements for, approve, acquiesce in, or give support of any kind to student transfers, between school districts, when the cumulative effect in either the sending or receiving school district will be to reduce or impede desegregation, or to reinforce, renew, or encourage the continuation of the acts and practices resulting in discriminatory treatment of students on the ground of race, color, or national origin.

 *United States v. Texas*, 330 F.Supp. 235 (E.D.Tex. 1971) (reprinted at 447 F.2d 441 (5th Cir.1971), which affirmed with modifications original orders in 321 F.Supp. 1043 (E.D.Tex.1970) and 330 F.Supp. 235 (E.D.Tex.1971)). In 1973 the federal order was amended to include additional guidelines for the decisions regarding student transfers:

 (3)(a) Where student transfers between school districts involve ethnic considerations concerning race, color or national origin of students, only hardship situations shall be considered....

 (b) In such situations, the [TEA] shall not approve transfers where the effect of such transfer will change the majority or minority percentage of the school population, based on average daily attendance in such districts by more than one percent (1%), in either the home or receiving district or the home or the receiving school.

 \* \* \* \* \* \*

 (4)(d) The agency will consider as factors relevant to its decision in approving or disapproving student transfers under this Section: (1) whether the receiving district or the home district is composed solely of one race or ethnic origin, (2) whether all the students seeking transfers are of one race or ethnic origin ....

 *United States v. Texas*, Amendments to Modified Order of July 13, 1971 (E.D.Tex. Aug. 9, 1973) (unpublished).

are designed to, or do in fact, create, maintain, reinforce, renew, or encourage a dual school system based on race, color, or national origin.

*See United States v. Texas,* 330 F.Supp. 235 (E.D.Tex.1971) (reprinted at 447 F.2d 441, 443–44 (5th Cir.1971), which affirmed with modifications original orders issued in 321 F.Supp. 1043 (E.D.Tex.1970) and 330 F.Supp. 235 (E.D.Tex.1971)). In sum, therefore, the parties stipulated that the Commissioner's sole role was to investigate the effect of the proposed boundary change on the segregated status of the two school districts to determine if the annexation would violate the "dual school system" provision of the federal order.[2]

In support of his decision allowing Forest Springs' detachment and annexation, the Commissioner made the following findings of fact and conclusions of law:

*Findings of Fact*

12. [Forest Springs'] detachment from Goodrich I.S.D. *will not* result in racial imbalance; however, it does change the majority and minority percentage of [Goodrich I.S.D.'s] school population, based on average daily attendance, by more than one percent.

14. There is no evidence that the detachment of Petitioner Forest Springs Subdivision from Respondent Goodrich I.S.D. is designed to or does in fact, create, maintain, reinforce, renew, or encourage a dual school system based on race, color, or national origin.

15. There is no evidence that the annexation of Petitioner Forest Springs Subdivision from Respondent Livingston I.S.D. is designed to or does in fact,

create, maintain, reinforce, renew, or encourage a dual school system based on race, color, or national origin.

*Conclusions of Law*

2. The change of boundaries resulting from detachment of the affected territory from Respondent Goodrich I.S.D. and the annexation of Forest Springs Subdivision, Petitioner, to Livingston I.S.D. does not violate Federal Civil Action No. 5281.

3. Detachment of the affected territory from Respondent and annexation of that territory to Livingston I.S.D. will have no significant adverse educational, economic, or social effect on the school districts or students involved.

The district court reversed the Commissioner's decision and held that, considering all the evidence, the Commissioner could only have concluded that Forest Springs' detachment and annexation would foster a segregated system of education.

### THE ISSUE

Although the parties have defined their dispute in terms of violation of the federal order, this Court does not sit to interpret and collaterally enforce a federal order. *See Prosper Indep. Sch. Dist. v. Central Educ. Agency,* 798 S.W.2d 661, 665 (Tex.App.—Austin 1990, writ denied). Instead, our review is governed by section 2001.174(2)(E) of the Administrative Procedure Act ("APA"), under which we review for substantial evidence questions committed to the agency's discretion and challenged by the parties on appeal. *See* Tex.Gov't Code Ann. § 2001.174 (West 1995). By stipulation the parties agreed that the creation, maintenance, rein-

---

**2.** Because Education Code section 19.022(i) mandates that the Commissioner *"shall* consider the educational interests of the students in the affected territory and the affected districts and the social, economic, and educational effects of the proposed boundary change" in deciding an appeal, we doubt the ability of the parties to waive by stipulation the Commissioner's consideration of these requirements. *See* Tex.Educ. Code Ann. § 19.022(i) (West 1991) (emphasis

added). However, the Commissioner specifically concluded that these requirements were satisfied, and neither party has attacked this conclusion on appeal. Moreover, although Goodrich attempted to withdraw its stipulation after the hearing before the Commissioner, it did not assign error by cross-point to the district court's affirmance of the Commissioner's refusal to allow the withdrawal.

forcement, renewal, or encouragement of a dual school system in violation of the federal order was the only educational effect of sufficient gravity to preclude Forest Springs' annexation to Livingston. Therefore, the issue before us is whether the Commissioner's decision to allow the annexation of Forest Springs to Livingston I.S.D. is supported by substantial evidence that such boundary change would not create, maintain, reinforce, renew, or encourage a dual school system based on race, color, or national origin.

## SUBSTANTIAL EVIDENCE REVIEW

 The TEA and Forest Springs allege that because the Commissioner's decision is supported by substantial evidence, the district court's judgment must be reversed. In conducting a substantial evidence review, we determine whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *Texas State Bd. of Dental Examiners v. Sizemore*, 759 S.W.2d 114, 116 (Tex.1988); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex.1984). We may not substitute our judgment for that of the agency and may only consider the record on which the agency based its decision. *Sizemore*, 759 S.W.2d at 116. The appealing party bears the burden of showing a lack of substantial evidence and cannot meet this burden merely by showing that the evidence preponderates against the agency decision. *Charter Medical*, 665 S.W.2d at 452–53. When there is substantial evidence which would support either affirmative or negative findings, the order will be upheld even though the Commissioner arrived at a decision contrary to that which the reviewing court might have reached. *Auto Convoy Co. v. Railroad Comm'n*, 507 S.W.2d 718, 722 (Tex.1974).

## ANALYSIS

An expert from the TEA, four parents of Forest Springs students, the superintendents from both the Livingston and Goodrich school districts, and a principal and teacher from Goodrich testified at the Commissioner's hearing. Dr. Robert Alexius, executive assistant to the Deputy Commissioner for Accountability at the TEA, investigated the proposed boundary change. Alexius emphasized at the hearing that he merely provides the Commissioner with numerical data regarding the racial composition of the affected schools and the anticipated racial change in the districts. Alexius testified that Goodrich I.S.D. would be 60.1% white if all children from Forest Springs were properly enrolled in Goodrich I.S.D. Livingston I.S.D. is 80% white. Alexius concluded that if Forest Springs' annexation were allowed, the white student population in Goodrich I.S.D. would decrease by 2.5 percent.

Alexius also explained that the TEA uses the federal order's one-percent transfer rule as a guideline in approving proposed boundary changes and that a boundary change which results in a one-percent change in racial composition raises a red flag for possible violation of the federal order. However, he stressed that these statistics were only one factor in the Commissioner's analysis of whether the proposed change would violate the federal modified order.

Both parties spent a significant amount of time in their briefs and at oral argument discussing the one-percent transfer rule. However, under the terms of the federal order, the one-percent rule applies only to the analysis of transfer requests; the section governing boundary changes was never amended and does not include a one-percent benchmark.[3] Due to their scope, boundary changes have broader social, economic, and educational ramifications than individual student transfers and are poorly suited to determination through application of a rote mathematical formula. Although we do not pass on the propriety of the TEA's use of the one-

---

3. Moreover, federal courts have held that, even when applied to transfers, the one-percent rule is properly used only as a guideline. *See Lee v. Eufaula City Bd. of Educ.*, 573 F.2d 229, 232 (5th Cir.1978) (holding that "in measuring the cumulative effect of a student transfer program on desegregation, the Court must do so from a qualitative viewpoint, without blind deference to a mathematical formula").

percent rule in analyzing boundary change requests, it appears that the Commissioner, if he considers the one-percent transfer rule in boundary changes at all, should use this quantitative piece of evidence as only one factor in assaying the broad, qualitative impact of a boundary change.

■ Even the federal court that issued the order has noted that the one-percent rule should not be applied rigidly. In a subsequent modification to its original order, the court stressed that, regardless of the percentage change in racial composition, the fact that the schools remain integrated is an important factor in assessing proposed transfer requests. *See United States v. State of Tex.*, Order Interpreting Modified Order of July 13, 1971 (E.D.Tex. Sept. 8, 1980) (unpublished).[4] The same holds true in evaluating the segregative effect of a boundary change. Evidence was presented that both the Goodrich and Livingston school districts operate as unitary school systems,[5] are not operating under any court desegregation orders, and enjoy good interracial relations.

Regardless of the applicability of the one-percent rule, Goodrich maintains that Forest Springs' detachment would precipitate defection to Livingston of other white neighborhoods currently within its boundary. Goodrich presented a significant amount of evidence that the proposed boundary change would affect it negatively, as witnessed by the Commissioner's statement that "the evidence presented barely shows ... that detachment and annexation is in the best educational as well as the best social interests of

the students in the affected territory." However, some of this evidence related only to economic issues, such as the district's loss of tax revenues, state funds and resulting budget problems, or the "status" of Goodrich's students vis-a-vis Livingston's—considerations that did not bear on the narrow "dual school system" issue the parties contested before the Commissioner and here on appeal. With regard to the dual school system issue, David Malone, superintendent of the Goodrich school district, testified that the detachment would have the short-term effect of increasing slightly the percentage of minority students attending Goodrich I.S.D. However, Malone speculated that if Holiday Estates and Siesta Country, two other all-white subdivisions bordering on the Livingston district, were allowed to detach, Goodrich's percentages would change so that black and Hispanic students would constitute the majority.[6] Based on this potential domino effect, Malone suggested that the Forest Springs' detachment could encourage a dual school system. Curtis Smith, a principal in Goodrich I.S.D., and Lorraine Barnes, a fifth grade teacher in Goodrich, also opined that the detachment would be a step toward resegregation that could eventually lead Goodrich back to a dual school system.

While we sympathize with Goodrich's position, its concern that the other white subdivisions will follow suit in seeking annexation to Livingston is speculation not supported by any specific evidence in the record. There is no suggestion that any other subdivision has applied for detachment from Goodrich I.S.D. Our holding in *Prosper* is instructive in this

---

**4.** In this unpublished case, which the parties relied on in construing the federal order below and which comes to us as part of the transcript, eight black and two white high school students who lived in Richards Independent School District but had attended school in Huntsville applied for a transfer to Huntsville I.S.D. schools. Richards was a small school district with 70% white students. Huntsville was a large school district with a 65% white population. The students transferring to Huntsville changed the racial balance of Richards by seven percent. In approving the transfers, the court emphasized that, regardless of the seven-percent change in racial composition, the Richards school district would remain integrated and that black and

white students would continue to attend the same school.

**5.** A "unitary" school system has completely remedied all vestiges of past discrimination. *See Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir.1991).

**6.** Goodrich North, another all-white subdivision, apparently does not share a common border with Livingston. *See* Tex.Educ.Code Ann. § 19.022(a) (West 1991) (requiring that the detached territory seeking annexation be contiguous to the school district).

regard. In that case we held that the loss of potential tax revenues based on a detached territory's anticipated reclassification from agricultural to commercial development land was speculative and reasonably disregarded by the county commissioners in approving the territory's detachment. *Prosper,* 798 S.W.2d at 666. We held that the commissioners' decision to give dispositive weight to the evidence of current tax values was justified and supported by substantial evidence, even though the future effect of a reclassification could be significant. *Id.*

Similarly, Goodrich's evidence that Forest Springs' detachment would precipitate "white flight" among other subdivisions was so speculative that the Commissioner was not bound to assign it dispositive weight. Two of the twenty-two children affected by the boundary change come from minority families, both of which signed the detachment petition. Four Forest Springs parents, including one black parent, testified at the hearing that the proposed boundary change was not racially motivated and emphasized that Livingston offered better educational and extracurricular opportunities for their children. The superintendent of Livingston, Dr. Gerald Major, supported the parents' position and testified that Livingston schools do not discriminate on the basis of race, color, or national origin and that he did not approve Forest Springs' annexation petition on the basis of race.[7] Forest Springs' nondiscriminatory intent may be one factor in the Commissioner's analysis of whether the proposed boundary change violates the dual school system provision of the federal order. *See Price v. Austin Indep. Sch. Dist.,* 945 F.2d 1307, 1315 (5th Cir.1991). Even Dr. Alexius, who originally assumed that all of the Forest Springs students were white, admitted that his perception of the boundary change as white flight was weakened when informed that two of the students affected by the annexation were minorities. While we appreciate Goodrich's concerns over the specter of white flight, we cannot say that the Commissioner's decision was unreasonable based on the current evidence in this case.

## CONCLUSION

The Commissioner's finding that the proposed boundary change would not create, maintain, reinforce, renew, or encourage a dual school system based on race, color or national origin is supported by substantial evidence. Although the boundary change would affect the racial composition of Goodrich by 2.5 percent, the school would remain integrated and unified. Substantial evidence was presented that Livingston offers better educational opportunities and a wider variety of extracurricular programs than does Goodrich and that these opportunities motivated Forest Springs to petition for annexation to Livingston. Although Goodrich offered testimony that Forest Springs' detachment constitutes a harbinger of future detachments that will result in resegregation, this evidence was speculative and inconclusive. Because the evidence supports the positions of both Goodrich and Forest Springs, we must uphold the Commissioner's decision. *See Auto Convoy Co.,* 507 S.W.2d at 722. We sustain TEA and Forest Springs' first point of error.

Due to our disposition of the first point of error, we need not address TEA and Forest Springs' remaining points of error. We reverse the judgment of the trial court and render judgment that the Commissioner's decision be affirmed.

---

7. Major admitted, however, that Livingston has received complaints about the recruiting and hiring of minority teachers and that Livingston is involved in an ongoing investigation and civil lawsuit initiated by the NAACP.