# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00676-CV

**Joseph E. Murphy, Appellant**

**v.**

**Commissioner of Insurance and Texas Department of Insurance, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. GN200559, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Joseph E. Murphy was licensed by appellee the Texas Department of Insurance ("the Department") to sell several kinds of insurance. In January 2000, the Department sought a hearing to determine whether Murphy's licenses should be revoked. After several continuances, a hearing was held before an administrative law judge ("ALJ"). The ALJ recommended that Murphy's licenses be revoked and that he be ordered to repay all amounts owed to National Guardian Life, an insurance company through which Murphy had obtained insurance policies for his customers. In December 2001, appellee the Commissioner of Insurance adopted the ALJ's recommendation and issued an order revoking Murphy's licenses. Murphy sought judicial review, and the district court affirmed the Commissioner's order. We affirm the district court's judgment.

**Standard of Review**

Judicial review of an action by the Commissioner is conducted under the substantial evidence rule and the Administrative Procedure Act ("the APA"). Tex. Ins. Code Ann. § 36.203 (West Supp. 2003); *see* Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2000 & Supp. 2003) (codification of APA). Under the substantial evidence rule, we may not substitute our judgment for that of the agency unless the agency's decision is not supported by substantial evidence when the record on which the decision was based is viewed as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2000); *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988); *Collins v. Texas Natural Res. Conservation Comm'n*, 94 S.W.3d 876, 881 (Tex. App.—Austin 2002, no pet.); *Texas Educ. Agency v. Goodrich Indep. Sch. Dist.*, 898 S.W.2d 954, 957 (Tex. App.—Austin 1995, writ denied). The issue is not whether the agency reached the correct conclusion, but whether there is a reasonable basis in the record for the decision. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984); *Collins*, 94 S.W.3d at 881. We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the appellant bears the burden of proving otherwise. *Charter Med.*, 665 S.W.2d at 453; *Collins*, 94 S.W.3d at 881. Such a showing is not made if the appellant merely shows that the evidence preponderates against the agency's decision. *Charter Med.*, 665 S.W.2d at 453; *Goodrich Indep. Sch. Dist.*, 898 S.W.2d at 957. If there is evidence supporting the findings, we will uphold the agency's decision. *Charter Med.*, 665 S.W.2d at 452-53; *Gerst v. Goldsbury*, 434 S.W.2d 665, 667 (Tex. 1968).

## Factual Background

Starting in 1982, Murphy received several licenses to sell life, accident, health, and automobile insurance and prepaid legal services. Murphy was an agent for several insurance companies, including National Guardian. Murphy is also "founder" of the Family Resource Network ("FRN") and Family-2-Family ("F2F"). FRN advertised that it could provide benefits, including life insurance, with no out-of-pocket expense for one year and that its members could get life insurance for zero money out-of-pocket.[1] F2F advertised "New Found Money," with which members could purchase various benefits, charge the costs to credit lines extended by F2F, and never have to pay those credit lines with out-of-pocket funds.[2] F2F explained that if a member bought a life insurance policy, costs incurred by that member, including the cost of the life insurance, could be repaid by the proceeds of the insurance policy, which was assigned to F2F.

---

[1] When a current FRN member introduced a new member, the current member earned $100. The new member would choose benefits, receiving a year-long credit line from FRN for the costs of those benefits. At the end of the year, the new member could stop participating, in which case the credit line for the previous year's use of the benefits was forgiven. Current members received a commission or bonus for new members they referred, as well as for members introduced by those new members. FRN would deduct a member's benefits premiums from commissions earned for introducing new members.

[2] A person paid $25 to become a Level 1 F2F member, receiving benefits that appear to revolve around bonuses paid for bringing new members into F2F. Level 2 membership costs $300 out-of-pocket and $900 from monies earned through the program. Level 2 benefits include an information program called "ACCESS" and optional benefits, including life insurance; the cost of optional benefits could be charged to the member's credit line. F2F emphasized that members did not pay for benefits with out-of-pocket money, except for ACCESS subscriptions. Members were encouraged to buy life insurance policies, which were assigned to F2F. Upon a member's death, F2F would deduct the money owed to F2F from the policy proceeds and pay the excess proceeds to the member's beneficiaries. Even if a member dropped out of F2F, the assignment remained in place.

Evidence was introduced showing that in 1992, Murphy was investigated by the Department when he inquired as to the propriety of FRN's advertising materials. The reviewed documents, which are different from the advertising used by Murphy most recently, stated that FRN was a multi-level marketing program that gave its members a newsletter, legal services such as wills, and other benefits such as "insurance for your family, a lifetime income for you," FRN contributions to members' savings and investments, FRN's payment of one-half of members' children's college tuition, and seed money for businesses. FRN covered the cost of all benefits with a loan, and FRN was repaid only from "referral bonus earnings and/or the benefit(s)." The materials state that if a member chose life insurance, FRN "has a collateral assignment on the insurance to the extent of the loan plus interest in the event of death before the loan is repaid." It appears that the Department instructed Murphy to take "all mentions of [insurance] out of advertisement," and that Murphy agreed to do so. In late 1992, the Department sent Murphy a letter stating that "[t]he material submitted has been given a limited review" and did not appear to be deceptive or misleading. The Department stated, "[T]his is not an approval or acceptance of the material and does not waive our right to reopen and review new facts that are brought to our attention or take any action authorized to remedy a violation."

Julie Bohler, National Guardian's accounting officer, testified that National Guardian paid its agents the full year's commissions in advance for policies sold by the agents, even though the premiums were paid throughout the year. The advanced commissions were not "earned" until the entire year's premiums were paid, and remained an obligation of the agent to National Guardian until fully earned. In August 1998, National Guardian terminated its agency arrangement with

4

Murphy, and in the same letter informed Murphy that he owed National Guardian about $130,000 in advanced commissions not earned due to early termination of the policies. In July 2001, Murphy and National Guardian entered into an agreement under which Murphy agreed to refund National Guardian about $112,000 over a three-year period.

Bohler further testified that National Guardian agents may not pay any client's premiums, fees, or other costs, except their own or their immediate families' policies. National Guardian set out this policy in its compliance manual sent to its agents in 1997, and reiterated it in a 1998 "compliance update," stating that National Guardian would not accept "[p]remiums that do not come directly from the insured applicant, and/or a payor with insurance interest." National Guardian's materials state that in the "rare occasion" that an insured must pay a premium with cash, the agent is to take the cash and write a personal check to the insured in the same amount; the insured is then to endorse the check over to National Guardian and submit the endorsed check along with the insurance application.

Murphy's accounts came to Bohler's attention when National Guardian noticed that premium checks for several of Murphy's insureds were all drawn on the same checking account at one bank. Although an account may have multiple signatories, such as a husband and wife, in this case, the checks were purportedly signed by six unrelated people with different names at different addresses. The checks looked similar, but each had a different name and address typed or printed at the top, and the numerical codes on the bottom were incomplete. Bank records show that the account on which the checks were drawn is a business account held by Financial Resource Network, with the same physical address as Murphy's insurance business. Murphy's son and daughter-in-law

5

are the authorized signatories on the account. Records show, and Murphy admits, that he deposited at least some of his National Guardian commission proceeds into the bank account, and "then Financial Network used that money to pay premiums."

Bohler testified that National Guardian did not have a written policy prohibiting agents from loaning money to their insureds for premium payments. She said that although it appeared after investigation that Murphy had loaned his insureds money for their premiums, "[w]e did not know that they were loans. We assumed—I mean, just by looking at that that they were coming out of the same account. He was depositing money into those accounts, and the premiums are coming out of it." Bohler stated, "[F]rom the way it looks, it's Mr. Murphy is one of the owners of the account. If he's depositing money into the account and paying the premiums out of it, that's violating one of our rules from the compliance manual."

**Analysis**

*Removal of Evidence*

First, we address Murphy's assertions that the Department removed evidence from the record.[3] For example, he states that the record indicates that the Department conducted

---

[3] Murphy, who was represented at the hearing level by an attorney, is representing himself *pro se* on appeal. We note that Murphy, while apparently attempting to comply with briefing and procedural rules, provides little in the way of statutory authority or case law to support his contentions, and makes somewhat inaccurate references to the record, referring the Court to statements by counsel and discovery responses rather than to evidence and testimony put forth in the hearing itself. *See* Tex. R. App. P. 38.1. *Pro se* parties, while allowed some latitude, are held to the same standards as are parties represented by legal counsel; to hold otherwise could give *pro se* parties an unfair advantage over parties represented by counsel. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184-85 (Tex. 1978); *Chandler v. Chandler*, 991 S.W.2d 367, 378-79 (Tex. App.—El Paso 1999, pet. denied). Further, Murphy's main source of "authority" is *Black's Law*

6

interviews with various people, but that the reports or transcripts of those alleged interviews are not in the record; thus, he argues, the Department has broken the law by removing "evidence" that Murphy believes is exculpatory from the record. We agree that an agency may not remove evidence from an administrative record. *See* Tex. Gov't Code Ann. § 552.351(a) (West Supp. 2003) (removing or altering public information is criminal offense). This means that an agency may not remove evidence that has been admitted before an ALJ or entered into the proceeding's record in any manner. *See id*. § 2001.060 (West 2000) (record includes pleadings, "evidence received or considered," proposed findings and exceptions, opinions or reports by hearing officer, and staff data submitted to or considered by hearing officer). The administrative record does not include all information collected by an agency during an investigation, and an agency is not required to enter all such information into the administrative record. Murphy does not point us to a place in the record where the Department allegedly failed to produce information such as notes or transcripts from interviews. It is not the Department's responsibility to introduce exculpatory evidence into the record; it is Murphy's responsibility to introduce his own defensive evidence. He may not complain on appeal that the Department did not mount a defense on his behalf. There are no indications that any evidence was actually introduced into evidence and then removed before the administrative

---

*Dictionary*, which, while helpful in determining the meaning of certain words or legal phrases, is not legal authority and does not provide this Court guidance in determining the legal issues of this cause. Nor do discovery responses, such as Murphy's answers to the Department's interrogatories, constitute evidence in and of themselves; such information must be presented to the fact finder for evaluation before it is considered evidence.

record made its way to the reviewing court. We overrule Murphy's contentions related to the alleged removal of evidence from the record.[4]

*Ratification or Limitations*

Murphy next claims (1) that the Department approved his program during its 1992 investigation and may not now take action against him, and (2) that the Department's current action is barred by the statute of limitations due to its 1992 investigation.

The Department closed its file in 1992 after Murphy agreed to remove all references to life insurance from the advertising materials. The materials reviewed then are not the same materials used by Murphy most recently, which contain extensive reference to life insurance, and the Department's closing letter clearly states that the Department did not waive its right to reopen the investigation should new facts come to its attention. The Department's 1992 investigation did not ratify or otherwise approve the program as it existed in 1992, much less as it was advertised years later by entirely new materials. Nor do the Department's records indicate that in 1992 the Department knew anything about Murphy's use of one checking account to write checks under different names in an apparent attempt to make the insurance company think that the insureds

---

[4] In his supplemental reply brief, Murphy relies on portions of a Department investigator's deposition as proof. However, that deposition was attached to Murphy's brief to the district court as an appendix; Murphy does not show that the deposition was introduced before the ALJ or otherwise included in the administrative record, nor does our review indicate that the deposition was made part of the administrative record. Further, even if the deposition had been introduced into evidence, it does not raise factual issues sufficient to overcome the substantial evidence presented by the Department and relied upon by the ALJ and the Commissioner.

themselves were writing the checks. We overrule Murphy's contentions that the Department approved or ratified Murphy's program by its earlier investigation.

Likewise, we hold that Murphy has not shown that the Department's action was barred by limitations. The Department did not approve the more recent advertising materials, and the record does not establish that the program remained the same until the present action. Further, the present action concerned Murphy's writing checks for premiums under different names on the same checking account and his owing National Guardian large sums of prepaid commissions. Those facts were not present in 1992 when the Department investigated Murphy's advertising materials and programs. We overrule Murphy's contentions that the Department's action against him was barred by the statute of limitations.

*Substantial Evidence*

Murphy argues that the following findings and conclusions are not supported by the evidence: National Guardian was unaware that Murphy paid premiums on behalf of insureds from the same checking account; Murphy had ownership of the cash values of the policies through assignment; when policies lapsed, Murphy had possession of the advanced, unearned commissions and the cash value of the policies; the advanced commissions and the cash values generated a net profit for Murphy; Murphy amassed $130,000 in unearned, advanced commissions from policies that were cancelled or lapsed; Murphy agreed in July 2001 to repay the unearned premiums; Murphy offered to pay the general public compensation for referring new clients; Murphy told potential customers that they would not have to repay the loaned premiums; Murphy received proper notice of the hearing; Murphy was guilty of fraudulent or dishonest practices under the insurance code;

9

Murphy violated the code by rebating or offering to rebate insurance premiums or commissions; Murphy violated the insurance code by paying a commission or other valuable consideration to unlicenced persons for the services of an agent; Murphy's licenses should be revoked and he should be ordered to make full restitution to National Guardian.[5]

Murphy repeatedly states that it is "undisputed" that National Guardian officials knew of and approved of Murphy's use of the one checking account to pay premiums for various insureds, pointing to his discovery response in which he stated National Guardian officials, including vice-president David Sugar, had knowledge of and approved of his program. However, his assertion in a discovery response does not constitute evidence, and simply stating that something is undisputed does not make it so. Murphy did not testify at the hearing or otherwise present evidence that National Guardian knew or approved of his scheme. Without his presenting any such evidence, the Department was not obligated to make a contrary showing.

Bohler testified that she first became aware of the payment scheme when National Guardian noticed that multiple, unrelated insureds were using the same checking account, which turned out to be the account into which Murphy deposited some portion of his advanced commissions. Bohler stated that such a scheme appeared to violate National Guardian's corporate policies. Bohler further stated that Murphy owed National Guardian about $130,000 in unearned

---

[5] In his supplemental reply brief, Murphy attempts to rebut the Commissioner's order paragraph by paragraph, frequently arguing that a finding of fact "is not evidence of an insurance code violation." However, not every finding of fact need be an insurance code violation in and of itself. Instead, the findings of fact state the factual background surrounding the allegations against Murphy. That some of the findings do not show or allege a violation does not render those findings irrelevant or incorrect.

commissions, and the State introduced into evidence National Guardian's record of paid commissions, National Guardian's termination letter, and the agreement between Murphy and National Guardian that he will repay $112,000 over a period of three years. Murphy's materials stated that FRN held an "absolute assignment" of its members' life insurance policies. Thus, evidence indicates that Murphy at least had the right to take possession of the cash value of any cancelled policies. The Department put on evidence of the sums Murphy earned from commissions and the cash values of the policies to which Murphy held absolute assignments, versus the premiums Murphy paid on behalf of his insureds. Those documents show that the commissions and the cash values of the policies exceeded the yearly premiums paid.[6] Although Murphy states that he was only to receive death benefits, he did not make this assertion below, and the marketing materials indicate not that he took an assignment of death benefits, but that he took an "absolute assignment" of the policies.

The evidence supports the findings that: National Guardian was unaware of Murphy's policy of paying premiums on behalf of insureds, expecting repayment from the proceeds of the policies; Murphy took possession of the full, unearned commissions, depositing them into the checking account he then used to pay premiums with checks altered to make it appear that the insureds themselves were the owners of the checking account;[7] when the policies lapsed, Murphy

---

[6] Murphy points to a discovery response from the Department in which the Department stated that it did not know whether Murphy had generated a profit through his programs. However, the Department stated it did not have such knowledge because it had not yet received National Guardian's records.

[7] Murphy argues that there is no evidence to show that he "possessed" or owned those funds, because he used those funds to pay premiums, loaning them to his insureds. However, it is not

had possession of the unearned commissions and the cash value of the policies, the combined value of which gave him a net profit; through the assignments, Murphy had ownership of the cash values of the policies; Murphy amassed $130,000 in unearned, advanced commissions from policies that were cancelled early or lapsed; and Murphy agreed to repay most of the unearned premiums.

Murphy contends that he did not offer to pay compensation to the general public for referral of new clients, arguing that he only made such offers to members of his associations. However, Murphy's materials were intended to induce the general public into becoming members in order to obtain the benefits described, including the payment of commissions or referral bonuses. The marketing described the structure under which members would refer new members, who would in turn refer more new members, building a bonus structure under each referring member. Merely requiring a person to sign up to become a member does not mean that Murphy's offer to pay compensation was not made to the general public. That the referring members were not agents and did not actually fill out insurance applications does not change the fact that the members were paid compensation for the work of an insurance agent. The members were not insurance agents or other licensed individuals. They were simply members of the public induced by offers of bonuses or other compensation into referring new insureds to Murphy. This amounts to more than a scintilla of evidence that Murphy paid bonuses or compensation to the general public for referring new business. Evidence also supports a conclusion that Murphy violated the insurance code by offering to rebate premiums or pay other compensation and by paying unlicensed persons for the services of an agent.

necessary for Murphy to have held those funds continually. It is enough that he deposited them into an account over which he had at least partial control, thus taking possession. What he did once the checks were cashed is of no importance to whether Murphy possessed the funds in the first place.

12

Those conclusions give the Department and the Commissioner a valid basis for revoking Murphy's insurance licenses.**[8]**

*Notice*

Murphy finally complains that the evidence does not show that he received proper notice of the disciplinary hearing, arguing that the Department did not give Murphy notice of the investigation as required by section 2001.054(c) of the government code.**[9]** Tex. Gov't Code Ann. § 2001.054(c) (West 2000). However, we have held that section 2001.054 does not require notice be given before a complaint is filed, but instead "that the complaint itself adequately inform the licensee of the subject of the adjudicative hearing." *Guerrero-Ramirez v. Texas State Bd. of Med. Exam'rs*, 867 S.W.2d 911, 918 (Tex. App.—Austin 1993, no writ). Section 2001.054 requires an agency to give a licensee notice of allegations against him and an opportunity to participate and defend at a hearing. *Id*. at 917-18. The administrative record in this cause contains several notices of hearings, provided to Murphy well before the actual hearing took place, setting out the allegations

---

**[8]** Because the evidence is sufficient to support the revocation of Murphy's licenses on other grounds, we need not determine whether the evidence is sufficient to show Murphy told members that they would never have to repay the loaned premiums. However, we note that the materials are at best confusing and verge on misleading on this point, highlighting that premiums are never repaid out of a member's pocket and that members can cancel at any time and not have to repay any loaned benefits premiums.

**[9]** Murphy also argues that because he was licensed under article 21.14 of the insurance code, he was allowed to finance premiums. *See* Tex. Ins. Code Ann. arts. 21.14, 24.20 (West Supp. 2003). However, this action was not based on unlicensed financing of premiums. That issue arose during the 1992 investigation, and the Department decided not to pursue any such charges.

13

against him and informing him of his right to participate. Evidence supports the conclusion that

Murphy received adequate notice of the complaints against him and of the hearing.[10]

## Conclusion

Having found sufficient evidence to support the Commissioner's order in all respects,

we affirm the district court's judgment affirming the Commissioner's order.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: December 4, 2003

---

[10] Murphy further asserts that the Department behaved improperly in requesting several continuances of the hearing, implying that the Department was not prepared to bring charges when it filed the notice of the hearing and was forced to litigate the issue when Murphy refused to "rollover and play dead." However, the fact that the Department made such requests does not throw doubt on the Department's case against Murphy. The Department's requests for continuance largely refer to settlement talks and discovery disputes or delays.

14