GREGG COSTA, Circuit Judge,
dissenting:
Louisiana, with post-Katrina New Orleans leading the way, has become an important, and early studies show successful,[1] laboratory for education reform. One of those reforms provides scholarships to low-income students to enable them to attend better schools, the type of schools that most lawyers take for granted that their children will attend. Whether those students will continue to receive those “dynamic educational opportunities” (Maj. Op. at 291) is not at issue in this appeal. The ruling that the Intervenors challenge did not prevent the students from receiving scholarships for the 2014-15 school year or the current one. What the district court did was order that the State of Louisiana turn over demographic information about enrollment to the Department of Justice, which wants to determine if the voucher program will have a negative effect on schools subject to desegregation plans. For two reasons, that is not a decision that we should review given the procedural posture in which this appeal arises.
First, I have significant doubts that the Intervenors have standing to bring this appeal. This Court’s earlier decision recognizing that the Intervenors have an interest in the case warranting intervention does not automatically establish that they have suffered a sufficient injury from the limited order being appealed to confer standing at this stage. See Diamond v. Charles, 476 U.S. 54, 68, 106 S.Ct. 1697, 90 *305 L.Ed.2d 48 (1986) (“Diamond’s status as an intervenor below, whether permissive or as or right, does not confer standing sufficient to keep the case alive in the absence of the State on this Appeal.”); see also Rohm & Hass Texas, Inc. v. Ortiz Bros. Insulation, Inc., 32 F.3d 205, 208 & n. 12 (5th Cir.1994) (“Merely because a party appears in the district court proceedings does not mean that the party automatically has standing to appeal the judgment rendered by that court.”). Certainly the In-tervenors would have standing to appeal a decision invalidating the voucher program. That would implicate the substantial injury of losing an educational opportunity for one’s child, which was the basis for allowing the intervention. Brumfield v. Dodd, 749 F.3d 339, 343-345 (5th Cir.2014). But the district court has not taken that step. At this point, it has deprived the students of nothing nor required them or their parents to do anything. Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (“The regulations under challenge here neither require nor forbid any action on the part of respondents .... ‘[Wjhen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily ‘substantially more difficult’ to establish.’ ”) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Only the State of Louisiana, which has not appealed, is under an obligation to produce the data. A third-party typically does not have standing to challenge an order requiring another party to produce information when no confidential data concerning the third party is at issue. There is no contention that is the case here. So the case for standing rests on a long chain of events that perhaps might lead one day to a ruling that would result in the injury of losing the scholarships: 1) the data would have to provide some arguable basis for concluding that the scholarship program is increasing segregation; 2) the Department of Justice (which by this point would likely be part of a different Administration) would have to seek to enjoin the scholarship program based on this data; 3) the district court would have to grant the motion. On its face, this many conditions entails a high degree of speculation. But the fact that the available data indicates that 85% of the scholarships in 2013 went to African-American students (Maj. Op. at. 291) means it is extremely unlikely — indeed almost unfathomable— that release of the full data would ever lead to enjoining the voucher program on the ground that it is resegregating Louisiana schools. If nothing else, that court action is not “certainly impending.” Clapper v. Amnesty Int’l USA, — U.S.-, 133 S.Ct. 1138, 1150, 185 L.Ed.2d 264 (2013).
Admittedly, however, the line between imminent and speculative injuries can be a fuzzy one. See Summers, 555 U.S. at 505 n. 2, 129 S.Ct. 1142 (“[I]mminence is con-cededly a somewhat elastic concept.”). More definite are the limitations on our ability to provide relief from a “void” judgment pursuant to Federal Rule of Civil Procedure 60(b)(4), which is the mechanism through which the Intervenors sought to vacate the order requiring the State to share the information. There are only “two circumstances in which a judgment may be set aside under Rule 60(b)(4): 1) if the initial court lacked subject matter or personal jurisdiction; and 2) if the district court acted in a manner inconsistent with due process of law.” Callon Petroleum Co. v. Frontier Ins. Co., 351 F.3d 204, 208 (5th Cir.2003). The majority opinion tries to fit the district court’s ruling as fitting into the first category of jurisdictional defects.[2] But because a *306 court’s issuance of an injunction that exceeds its equitable powers does not undermine the court’s subject matter jurisdiction, Rule 60(b)(4) is the second bar to reaching the merits of this appeal.
“Jurisdiction” is a term that can mean different things, usually related to a court’s power or authority to do something. See United States v. Cotton, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (noting that a prior Supreme Court decision had relied on an “elastic conception of jurisdiction” different from the more limited notion of subject matter jurisdiction); see also Black’s Law Dictionary (10th ed.2014), 981-83 (listing four definitions for “jurisdiction” and over three pages of definitions for particular types of jurisdiction). But as the Supreme Court has recently explained, only a “certain type of jurisdictional error” justifies the “rare” act of Rule 60(b)(4) postjudgment relief. United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 268, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010). As already mentioned, both in this circuit and others, those types of jurisdictional error are limited to when a court “lacked jurisdiction of the subject matter, or of the parties.”[3] 11 Charles Alan Wright & Arthur Miller, Federal Practioe and Prooedure § 2862 (3d ed.); see also 12 James Wm. Moore, Moore’s Federal Practice § 60.44[l][a] (“A judgment is valid whenever the court that renders it has jurisdiction over the subject matter and the parties. In other words, a judgment is void, and therefore subject to relief under Rule 60(b)(4), ‘only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard.’ ”) (internal citation omitted).[4] We thus have recognized that even when a court lacked authority, or one might colloquially say “jurisdiction,” to take a certain action, Rule 60(b)(4) is not an avenue for relief.
Callón Petroleum was a case brought in federal court to recover on a bond. By the time the court entered judgment in favor of the plaintiff, a state court delinquency proceeding for the defendant had commenced, which resulted in entry of an order that it was later argued prevented the federal court from entering judgment. The federal court’s diversity jurisdiction was enough to defeat the Rule 60(b)(4) motion even though we noted that Burford abstention was probably appropriate given the state insolvency proceeding. Callon Petroleum, 351 F.3d at 208-09.
*307 Just as the existence of diversity jurisdiction in Callon Petroleum was enough to defeat the Rule 60(b)(4) motion, the existence of federal question jurisdiction in this section 1983 case that was filed more than four decades ago should end our inquiry. That is true even if the court here, as the majority opinion concludes, went beyond its equitable powers in ordering the state to produce the data. Courts in areas of the law ranging from bankruptcy to the Tucker Act have long recognized that a court’s exceeding the scope of its equitable powers does not mean it lacked subject matter jurisdiction. See, e.g., Gordon v. Washington, 295 U.S. 30, 36, 55 S.Ct. 584, 79 L.Ed. 1282 (1935) (“Since the court had power to act, it is necessary to consider the various objections urged to. the decree only in so far as they are addressed to the propriety of its action as a court of equity. These objections were not foreclosed by the determination that the court had jurisdiction”); Turner Const. Co. v. United States, 645 F.3d 1377, 1388 (Fed.Cir.2011) (finding an order that the Army reinstate a contract did not raise a jurisdictional question because, while the appellant “frames this challenge as a jurisdictional argument, it is actually a challenge of the scope of the Court of Federal Claims’ equitable powers” and these “concepts are distinct”). We recognized as much in In re Zale Corp., 62 F.3d 746 (5th Cir.1995), when we offered the following explanation for why we first had to decide a difficult question of subject matter jurisdiction “[bjefore we address[ed] whether the bankruptcy court properly exercised § 105 power to issue the injunction”:
Subject matter jurisdiction and power are separate prerequisites to the court’s capacity to act. Subject matter jurisdiction is the court’s authority to entertain an action between the parties before it. Power under section 105 is the scope and forms of relief the court may order in an action in which it has jurisdiction.
Id. at 751 (quoting In re Am. Hardwoods, Inc., 885 F.2d 621, 624 (9th Cir.1989)).
United States v. Texas, 158 F.3d 299, 311 (5th Cir.1998), and the similar cases on which the majority opinion relies to establish that the problems it identifies with the court order are jurisdictional ones that implicate Rule 60(b)(4), is consistent with the line Zale draws. It says that “federal remedial jurisdiction goes only so far as the correction of the constitutional infirmity.” [5] Id. at 311 (emphasis added). That statement relied on authority like Missouri v. Jenkins[6] and Milliken v. Bradley,[7] which are taught in law school courses on Remedies, but that say nothing about subject matter jurisdiction and thus are not mentioned in Federal Courts. Compare Douglas Laycock, ModeRN Ameeican Remedies (2d ed.1994) at 284-93, 300-309 (discussing Jenkins, Milliken, and other cases addressing the scope of equitable power), with Charles Alan Wright and John B. Oakley, Federal Courts: Cases AND Materials (10th ed.1999) (not' mentioning these cases). Indeed, the majority opinion cites no case ever granting Rule 60(b)(4) relief based on a court’s exceeding its equitable *308 power. Nor any case finding more generally that an overly broad injunction (or absence of authority to award some other remedy) goes to a court’s subject matter jurisdiction.
This absence of authority is telling and should be dispositive. If any doubt remains, however, other situations in which courts have rejected Rule 60(b)(4) motions further demonstrate the inapplicability of the rule in this case. The Tenth Circuit twice refused to grant Rule 60(b)(4) relief to vacate consent decrees that may have been unlawful, concluding that those legal errors did not undermine the court’s subject matter jurisdiction. Equal Employment Opportunity Com’n v. Safeway Stores, Inc., 611 F.2d 795, 799-800 (10th Cir.1979) (refusing to find consent decree void under Rule 60(b)(4) even though the “grant of enhanced seniority rights to all post-decree transferees rather than to all employees or to minority transferees only does not fulfill any legitimate purpose of Title VII”) V.T.A., Inc. v. Airco, Inc., 597 F.2d 220, 226 (10th Cir.1979) (“Even if the parties’ consent decree does technically run afoul of federal patent law principles, the problem would be one of relief from an erroneous judgment, not a void one. The district court had requisite jurisdiction over the parties and over the subject matter.”). Safeway Stores explained the reasoning this way:
It is not the purpose of Rule 60(b) or the inherent powers of chancery to allow the modification of a consent decree merely because it reaches a result which could not have been forced on the parties through litigation.... The fact that a consent decree exceeds the law by prohibiting lawful conduct, or by granting an unauthorized remedy, does not render it void. Such efforts may be grounds for reversal on appeal of the judgment, but they are not grounds for collateral attack.
Safeway Stores, 611 F.2d at 799-800 (internal citations omitted).
The Supreme Court’s recent Rule 60(b)(4) case, with bankruptcy again being the subject matter, provides the final illustration of just how narrow the Rule is. The Court explained that Rule 60(b)(4) relief was not warranted because the Bankruptcy Code “requirement that a bankruptcy court find undue hardship before discharging a student loan debt is a precondition to obtaining a discharge order, not a limitation on the bankruptcy court’s jurisdiction.”' Espinosa, 559 U.S. at 272, 130 S.Ct. 1367. The relief the bankruptcy court ordered — discharge of the student loan without a hardship finding — was thus unlawful, but that did not render the judgment void. The same is true here, even if the majority opinion is correct that the relief ordered by the district court was unlawful.
Espimsa also explains why it is important to preserve the limited meaning of a “void judgment”:
Although the term ‘void’ describes a result, rather than the conditions that render a judgment unenforceable, it suffices to say that a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final. The list of such infirmities is exceedingly short; otherwise, Rule 60(b)(4)’s exception to finality would swallow the rule.
Id. at 270, 130 S.Ct. 1367.[8] That interest in finality, along with the interest in restraint, is particularly strong here. The *309 students are receiving the scholarships, the Department of Justice was getting the data it wanted, and the State did not see the need to appeal with its program intact.
The majority opinion’s “rats” hypothetical undoubtedly describes an extreme abuse of judicial authority. But courts act outside the scope of their authority all the time, sometimes outrageously so but more often as a result of the difficulty and variety of the issues we face. It would likewise be a flagrant violation of the law for a court to award a $100 million punitive damages award against a municipality in a section 1983 case. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding that section 1983 does not permit an award of punitive damages against a municipality). Because of the blatant error, such an award would be readily correctable in the normal appellate posture. A punitive damages award exceeding the court’s remedial power would not, however, mean that the court lacked subject matter jurisdiction. See Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist., 786 F.3d 400, 408, 413 (5th Cir.2015) (affirming a dismissal pursuant to Rule 12(b)(6) for failure to state a claim, rather than pursuant to 12(b)(1) for lack of subject matter jurisdiction, of a RICO claim seeking treble damages in fight of City of Newport). The same would be true for the rat court’s abuse of its remedial power. That error, like all others including the unauthorized desegregation orders the majority opinion cites, is correctable on direct appeal. But it is not among the errors that can be asserted under the “rare” 60(b)(4) procedure. Espinosa, 559 U.S. at 271, 130 S.Ct. 1367.
The majority opinion may well be correct that the Department of Justice should have litigated this issue in the numerous school desegregation cases still pending in Louisiana federal courts rather than this one that focused on state aid to segregation academies. And the statistics showing that 85% of the scholarship recipients are African-American indicate that not just its litigation strategy, but also its concern about the potential effect of the voucher program on desegregation may have proven misguided. But vigilance about retrenchment in the area of school desegregation is not. See Marguerite L. Spencer and Rebecca Reno, The Benefits of Racial and Economic Integration in Our Education System: Why This Matters for Our Democracy, Kirwan Institute for the Study of Race and Ethnicity, The Ohio State University (Feb. 2009) at 13 (“The number of nearly all-minority schools (defined as a school where fewer than 5% of the students are white) doubled between 1993-2006.... In 2005-2006, 56% of Hispanic students attended a school in which at least half of the student population was Hispanic, and nearly 50% of black students attended a majority black school.”). For the years of blood, sweat, and tears that went into the efforts to achieve desegregation didn’t just help us finally realize the promise of the Fourteenth Amendment. That work also resulted in integrated schools — albeit too few and too short-lived — that provided substantial gains for minority students. See, e.g., id. at 13 (“[Djes'egregation has been positively finked to increases in black student achievement levels, generating gains on average of .57 of a grade year at the kindergarten level, and on average of .3 of a grade year in student performance at the elementary/secondary school level.... Some argue that since most school reforms have little or no effect on improving students’ outcomes, the modest impact that desegregation has on student achievement relative to these other reforms is substantial.”); Rucker C. Johnson, Long-Run Impacts of School Desegregation & School *310 Quality on Adult Attainments, National Bureau of Economic Research Working Paper 16664 (Jan. 2011) 35 (study of over 8,000 people born between 1945 and 1968, tracked through 2011, which concluded that “school desegregation significantly increased educational attainment among blacks exposed to desegregation during their school-age years, with impacts found on the likelihood of graduating from high school, completed years of schooling, attending college, graduating with a 4-year college degree, and college quality”).
In light of the standing and Rule 60(b)(4) obstacles to our review, however, I would leave to another day — a day that is very unlikely to ever arrive — the issues concerning the scope of the district court’s equitable power to address concérns about desegregation in this proceeding.

. Douglas N. Harris, Good News for New Orleans: Early Evidence Shows Reforms Lifting Student Achievement, 15 Education Next 8 (Fall 2015).

. The opinion does include a couple refer-enees to a lack of due process. Maj. Op. at *306 303-04. The district court only issued its challenged order after providing the State with "notice [and] an opportunity to be heard.” United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 271, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010) (describing the Rule 60(b)(4) due process standard).

. And even when subject matter jurisdiction is at issue, "[o]nly when the jurisdictional error is 'egregious' will courts treat the judgment as void.” Cation Petroleum, 351 F.3d at 208 (quoting United States v. Tittjung, 235 F.3d 330, 335 (7th Cir.2000)).

. Whether the "jurisdictional” errors subject to Rule 60(b)(4) correction are limited to those involving defects in subject matter or personal jurisdiction appears to be the crux of the panel’s disagreement. On this point, the majority opinion is correct that Espinosa did not specifically refer to subject matter or personal jurisdiction when mentioning the “type of jurisdictional error” correctable under Rule 60(b)(4). Notably, however, it cited with approval these sections of the two leading federal procedure treatises that characterize those two types of jurisdiction as the only ones that warrant Rule 60(b)(4) relief. Espinosa, 559 U.S. at 269, 130 S.Ct. 1367. More importantly, the lack of a more direct Supreme Court holding on this question is of no' moment when our own case law recognizes the limitation. See Callon Petroleum, 351 F.3d at 208.

.Further proof that United States v. Texas did not involve a problem of subject matter jurisdiction (a term not mentioned in the opinion) is that we reversed the order rather than vacated it. See U.S. v. Texas, 158 F.3d at 312. The latter is the proper resolution when subject matter jurisdiction is lacking. See, e.g., Howery v. Allstate Ins. Co., 243 F.3d 912, 921 (5th Cir.2001) (vacating and remanding with instructions to dismiss due to lack of subject matter jurisdiction).

. 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

. 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

. Expanding the reach of Rule 60(b)(4) makes even less sense in the context of an injunction because Rule 60(b)(5) provides a mechanism for relief when an injunction in a long-running institutional reform case like this one “is no longer equitable.'' Fed.R.Civ.P. 60.